We're going to hear counsel in Roberts v. Bassett, 22-622. Thank you, Your Honor. And may it please the court. When thought for plaintiffs, Jonathan Roberts and Charles Arushka, who are here with us in the courtroom today. Plaintiffs seek equal access to potentially lifesaving COVID-19 treatments. But New York City believes that a race-neutral system for distributing COVID treatments would be tantamount to racial discrimination. In December, the city directed medical professionals to follow the state's directives and to use race as a factor in allocating treatments. The plaintiffs in this case, like the plaintiff in the last case, have standing to challenge the state's directives. But unlike the plaintiff in the last case, the plaintiffs here are lifelong New York City residents. So they also have standing to challenge the city's directive and a viable claim against the city for nominal damages. Plaintiffs here are therefore entitled both to prospective and retrospective relief. They are entitled to prospective relief because the state represents the challenge directive, has not been superseded, and acknowledges that supply shortages can occur at any time. Why do you claim, as I think you do, that there's a reasonable expectation, quote unquote, that the guidance will once again come into effect? Well, I think I claim that, we claim that because of what the state has said in their declarations, that the directive has not been superseded, that the supply shortages can happen at any time. If you think about- Well, Ken, excuse me, I think that Judge Gorenos' question was sort of a reasonable expectation that it would.  Do you think the standard is, as you sort of just phrased it, if it is possible that at some point in the future, supply chains could break down or there could be another temporary shortage? If that is a possibility, is that enough for standing? Is that your position? Well, it's not merely possible, Your Honor. I think it is a reasonable expectation because we're talking about COVID here. So it's a reasonable expectation that it will happen, that there will be a shortage of Pax Lovit in the future. Sure, Your Honor, and I think we have much more of a reasonable expectation in this case, compared to the plaintiff in Bauer, that he would contract, you know, mad cow disease. Here, we're talking about the coronavirus pandemic we've seen in the past two years. Unexpected, unforeseen variants, unforeseen supply shortages, unforeseen lockdowns. If we're talking about the injury being an exposure to a risk, which is, I gather, your contention, the plaintiff in Bauer, there's a very high likelihood that he will consume meat, which is what he contends creates the exposure to the risk. Here, what creates the exposure to the risk is a combination of shortages in drugs that are now plentiful on the market in the particular place where an individual, where one of your clients then also gets sick, and is deprived of the medication on account of, well, they don't have to get sick, they have to get sick and therefore they're competing on an unlevel playing field. But there is this intermediary contingency that doesn't exist in Bauer. That's why I'm struggling with that analogy. So, I don't think there is, your honor, because in Bauer, I mean, your honor asked about the number of people who could be affected and who have standing. And I think the number of, you know, white residents who are otherwise eligible for these treatments, that pales in comparison to the number of plaintiffs, possible plaintiffs in Bauer, which is meat eaters, American meat eaters. And I think the fact that there are many people withstanding here goes to the fact that this is COVID, which, as we've learned in the last two years, can affect millions of people at once. But you also need the shortage, right? So even if we grant you that COVID can affect everyone, the policy doesn't come into play until you also have a shortage. What's the analogy to that in the Bauer case? So, we do need a shortage. And I think the proper analogy, you know, you can talk about Bauer. You can also talk about cases like the Jacksonville, City of Jacksonville case, Associated General Contractors case, where, you know, the court didn't really look at this particular contract or that particular contract that was going to be bid on. It just looked at overall, there were going to be contracts with racial preferences. And those preferences put the plaintiffs there and its members at an unequal playing field. But it was certain there would be contracts. Sure. And I would say here, the state itself expects there to be shortages. No, no, no. What you quoted the state as saying, now I'm not sure, maybe this was your misspeaking, was there is a possibility. There is always a possibility, is what you quoted them as saying. Now, maybe they said something stronger. But there's always a possibility that we could be invaded by space aliens. It could happen. We don't know. We don't know where there are space aliens or there aren't. It's possible. Now, I grant you that's outlandish. This is probably not outlandish. But the question of how likely does it need to be on a going forward basis? I mean, more likely than that Mr. Lyons might have another encounter with the police where they used a chokehold? Your Honor, in Lyons, there was no official policy. Here, there was an official policy from the state side and the city side. Right, so we're predicting what's going to happen. I don't think that we need to make any more of a prediction in this case than courts in the education admissions cases, where there's no guarantee that race will be a factor with regard to any particular applicant. But regardless, because race is used in admissions decisions, those cases, regardless of the merits, they've come out different ways on the merits. But you still have to be an applicant, and there are lots of people who are applicants, and there are many people who aren't. But what we're talking about here, it seems to me, is something that does feel very speculative if what we're saying, at least on the future look, is a different question with respect to what happened in the past. But with respect to the future and injunctive relief, how likely does it need to be that there will be shortages of these particular drugs in the future in order for you to have standing? What is your view of it? Because I don't know if there's a clear – what is even the formulation? Reasonable likelihood, reasonable certainty, probability, some likelihood, mere possibility? What is it? So I think we have claims for retrospective and prospective relief here. But I'm asking about the prospective for now. Right, Your Honor. So for prospective relief, I think it has to be a reasonable likelihood. And I think what your question gets at with sort of the applications in the education admissions cases is this line that the Supreme Court has drawn about individuals who are willing and able to compete for the benefit. So, of course – No, no. But we're talking about the likelihood of the shortage here. Right. And so the question is what – I'm just trying to figure out. You said, okay, reasonable likelihood. Is that something that they admitted? Or is there some expert on your side that says there is a reasonable likelihood? If that's the standard – I don't know if it is, but that's the language you picked of the range for now. Is there somebody who says reasonable likelihood? Well, this was dismissed at the pleading stage, so we don't have experts in this case. But I think you would get the reasonable likelihood. What is the allegation? The allegation is that COVID is an unpredictable pandemic. Supply shortages, supply chain disruptions can occur at any time. And the government itself – Can occur. And the government itself says what about that? The government itself acknowledges all of those facts and has not rescinded the prior directive in response to direct questioning from the district court. And if the government didn't expect the shortages to occur in the future, I think it raises a question about why it didn't do that. Why not rescind it? Correct, Your Honor. Thank you. I'll reserve my time. Thank you, Your Honors. May it please the court, you're getting the state again, and then you'll get the city. This is Andrea Trento from the Office of the Attorney General. Well, Mr. Trento, why don't we pick up right where we left off. Yes. Why do these things still exist if there's no reasonable likelihood that this is ever going to happen again? Why not wait until it does and then see whether at that time the science is different or better and issue new guidance? Well, the guidance itself has been it is not being applied for that very reason, Your Honor. There is no shortage right now. There's no expectation that there will be a shortage. No one is predicting that there will be a shortage. Of course it's always possible that there's a shortage. But the guidance, that aspect of the guidance that directs prioritization in times of shortage is just not being applied on its face. Well, let's go back to this question of why it's still there. Why create undue anxiety among members of the community, substantial numbers of persons in the community, by having that there, this provision, which appears to suggest the distribution of medicines of some kind on the basis of race? Well, it was there, Your Honor, because there was a shortage. We understand that. You say there's no shortage now. Correct. So you're prepared to rescind this guidance? Well, the guidance hasn't been rescinded. I can't speak to what the department, what was going through the mind of the department when it made a determination whether to update it as opposed to rescind it. But I suspect, well, I don't know what the answer to that is, Your Honor. I know that what the department did was make an announcement that that aspect of the guidance that says this prioritization is to be applied in times of shortage or supply chain limitations is no longer in effect. The physicians are encouraged to explore all treatment options as early as possible. Can we go back then? Mr. Fott didn't get to it, but he did make the point that he's challenging not only going forward, standing to get injunctive relief, perhaps. He's also raising the question of standing for some form of retrospective relief. And you just said, well, this was in effect for a period of time. Now, I take it none of the plaintiffs are able to establish physical damages because they either never got COVID or they got drugs or whatever. No one's saying that, no plaintiff is saying that he or she was denied the drugs. But I'm sure Mr. Fott would suggest that nominal damages could apply if this policy was in effect and was illegal. Even if no one has found a plaintiff who could actually claim to have been physically harmed by it. So what's wrong with that theory of standing, at least looking retrospectively? Well, Commissioner Bassett has been sued only in her official capacity as an officer of the state. And so any claim for damages against Commissioner Bassett, nominal or otherwise, is barred by sovereign immunity. And so the court lacks jurisdiction over that claim for that reason, for that independent reason. And so with regard to nominal damages, that is just not something, with regard to the state at least, that the court really needs to trouble. So they're only suing, well, I guess we'll have to hear from the city then, is what you're saying. I can't speak for the city, yeah. On nominal damages. That's correct. And if I could- We'll hear from them. If I could address the question that Your Honors raised about how to try to tie Bauer, analogize Bauer to this case, given the fact that we're not in a supply chain shortage right now. And I think, I mean, this is a thought experiment, so I don't know that, you know, it requires a little bit of creativity. But I think it would be as if, in Bauer, the prospect of mad cow disease were to suddenly no longer be extant. It's no longer the case that this disease is circulating among the cows in England or wherever. It may come back, but we don't know. For now, it's not. And so that would be the analogous situation. You'd have a plaintiff suing on a hypothetical, maybe this will one day return again. I may one day again be exposed to this disease by consuming this meat, but he's not right now. And that's the case we have here. So unless the Court has any further questions. Thank you. Oh, yeah, sorry. Always happens to me. Good afternoon, Your Honors. May it please the Court. Diana Lawless on behalf of the city. So I just want to make sure Your Honors are aware of what the city did here. So the city's advisory is on JA 4242. The city advised clinicians to adhere to the state's guidance on prioritization during the time of severe resource limitations and should consider race and ethnicity when assessing a risk among those things. So I think when it comes to standing with respect to the city, I know, Your Honor, Judge Lynch, you wanted to talk about nominal damages. I think that any claim here of concrete unparticularized injury is still speculation piled upon speculation. I think the Supreme Court has said recently in the Yuseg Gabon case, nominal damages have to be for redress for a completed violation of a legal right. I think that they would have had to have suffered some sort of damage. They would have had to have contracted COVID during the shortage period for liability to attach. And the reason, and I also think that applies to prospective relief, because I struggle, as Your Honors have struggled, with the application of the barrier test in the city of Jacksonville test. And there, as Your Honors have discussed, the contractors were ready and able to bid on contracts. The contracts were always going to exist. There was a city policy that created the barrier to the access to the contracts. Here there's plenty of factors that were beyond the city's control to prevent the plaintiffs from identifying any injury. I think any barrier case, every barrier case the Supreme Court has found, has had a centralized and binding government contract, government process. Here this is a decentralized process. There's innumerable health care providers, mostly private actors. The city advisory is nonbinding, and we put in, Judge Cabranes, you may be interested in looking at this about why we did this. The Morse Affidavit from our chief health officer, she explained that we did it. to follow not only the state guidance, but also to raise awareness that this could be a factor. It's not a mandate. The city would not have taken any enforcement actions against anyone for not following it. The city had no way of tracking anything. There's no matrix. There's no point system. All it says is, among other factors, one should consider race and ethnicity. And in fact, hearing from plaintiff's counsel in the other case, the Jacobson's case, when he's saying this is an FYI bulletin, and everything he said on reply in his rebuttal argument about, well, if they had just said consider this as a factor, I think that's what the city's policy did here. Well, but the city's policy uses imperative words. It says adhere to New York State policies. It later says on page appendix 41, supplies will initially be extremely limited. While supplies remain low, adhere to the New York State Department of Health guidelines. Later it says eligibility, oral antiviral treatment is authorized for patients who meet all the following criteria, and then one of them is have a medical condition or other factors that increase their risk for severe COVID. Consider race and ethnicity when assessing. These sound like requirements, whether there's a penalty for it. And maybe the city oversteps. Maybe it's not entitled to tell doctors what to do. But it sounds like you're telling doctors what to do. Well, we're advising doctors, right? These are health advisories that get sent to a number of health care providers. They're posted on the city's health department's website. Adhere to the state's policy. I guess then we piggyback on all the arguments that the state says about how this is not, this is advisory. And then also what your honor quoted about, here's the criteria. Those were from the FDA criteria from the emergency use authorization. So we're not saying do anything other than, you know, this is the information that's out here. Does your department have any regulatory authority over doctors? There's regulatory authority over doctors that I personally, for the purpose of this case, I'm not aware of the extent of it. But for the purpose of this policy, it's really a health advisory. It's something called a health advisory. They just distribute via e-mail, and then it's posted on our website. For this purpose, it's undisputed that we weren't going to do anything with respect to anyone, with respect to how these medications were going to be distributed. Well, when you say you weren't going to, there's, you know, it's fine to say after the fact, we were determined to use our prosecutorial discretion not to do anything. But if you had issued a criminal law that says you're in violation of law if you do X, nobody has any way of knowing that. I'm still interested in the question of what is the regulatory authority, if any? I mean, suppose you had something that, you know, there were mandatory things, mask mandates, for example. If you issued a mask mandate and people defied it, what could theoretically happen to them? Well, I have to say that I personally am not very well aware of the framework as to what happens, but I know that the health department is allowed to issue regulations, is allowed to have anything that's enforceable. What this is- Perhaps counsel for the city and the state would do us the service of sending us a letter, a short letter, pointing out whatever authority this department may have over physicians or other health providers. Sure. It would be helpful, I think. Thank you, Ron. We will do that. Thanks very much. But I will say also to continue the test for standing, even if there could have been anything that could have been done, which we say there wasn't anything here, with respect to the city in particular, with respect to both of these things, you can't trace the injury to the advisory, right? Because doctors are finding, like, this information is undisputed, is based on information from the CDC and the medical literature of the nature of the AMA and the amici talk about. So it's hard to say that a single doctor's decision, right? They're not coming to the city. They're not coming to the state to get the medication. They're coming to a doctor. So there's nothing to say that what the city did with this policy is what's causing the injury. And the claims are, for similar reasons, are not redressable. What they're asking for is an order striking down the advisory. What they want is access to treatment without regard to race. But CDC guidance that says these things about concerning race would still be in place, as will extensive medical evidence, the medical evidence that the amici talk about. So I think for standing, it's just really impossible to show that this specific, in the case of the city, this specific document caused any injury to these plaintiffs, in particular, who just basically allege that they wish they had access to this medication. Thank you, Ms. Walsh. Take one minute, sir. Thank you, Your Honor. If I may, I'd like to make three quick points on rebuttal. First, the state tries to distinguish Bauer, but just read the facts of Bauer itself. There was no evidence of the disease in the United States in the past 13 years in Bauer, and they tested 6,500 animals, and there was no disease. And I think our chances of injury was much higher than the injury in Bauer. So second, the city's directive, you can find this on Joint Appendix 40, instructed providers to adhere to the state's directives, which instructed them to use race as a factor in allocating the treatments. I think that's enhanced risk that entitles us to retrospective relief under Bauer. And then third, New York makes a big deal about this is a decentralized process, but they made the exact opposite argument in the New York v. United States case decided by this court two years ago in which they relied on individuals disenrolling from public benefits. And the central inquiry of this court is- In that case, the government agency itself adopted the regulation in order to deter people from seeking the benefits, right? Just the same in this case, Your Honor. You also have the predictable effect on third parties because the state and the city argues before you today, and they have said in sworn declarations to the district court that these directives further a compelling interest in protecting public health. And it strains the authority to believe that they would have no effect if they wanted to do that. Thanks very much. Thank you. We'll reserve the decision, and we are adjourned. Court is adjourned.